# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

THE RECEIVERSHIP ESTATE OF BLUE
ISLE MARKETS INC. and BLUE ISLE
MARKETS LTD., derivatively through its
creditors,

              Plaintiffs,

    vs.

EQUITI CAPITAL UK LIMITED and
EQUITI ARMENIA CJSC,

              Defendants.

---

# COMPLAINT

---

The Receivership Estate of Blue Isle Markets Inc. and Blue Isle Markets Ltd., derivatively through its creditors ("Receivership Estate" or "Plaintiff") hereby seeks through this Complaint to avoid and recover all fraudulent transfers, made to or for the benefit of Defendants Equiti Capital UK Limited ("EUK") and Equiti Armenia CJSC f/k/a Divisa AM CJSC ("EAM," collectively with EUK, "Defendants"), from accounts owned or controlled by Blue Isle Markets Inc. and Blue Isle Markets Ltd. (collectively, "Blue Isle") during the four-year period preceding the filing of this Complaint pursuant to the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), C.R.S. § 38-8-101 *et seq.*, and as extended further by the one-year-from-discovery provision pursuant to C.R.S. § 38-8-110(1)(a). Plaintiff further seeks relief for Unjust Enrichment, imposition of a Constructive

Trust for Plaintiff's benefit against Defendants and such other relief from Defendants that the Court may deem equitable, just, and appropriate.

## I.     NATURE OF THE ACTION

1.      From 2016 to 2019, Mediatrix Capital, Inc. ("Mediatrix") and Blue Isle (collectively, "Mediatrix/Blue Isle") operated a fraudulent, excessive trading/Ponzi scheme involving foreign currency ("forex") trading for which they and their principals, Michael A. Young, Michael A. Stewart, and Bryan E. Sewall (collectively the "Mediatrix/Blue Isle Principals") have been sued by the U.S. Securities and Exchange Commission in a civil enforcement action for securities fraud and prosecuted by the U.S. Attorney's Office for the District of Colorado in a parallel criminal action.

2.      Through a variety of false representations that portrayed Mediatrix as the architect of a consistently high-performing, low-risk algorithm forex trading program executed through its "independent" broker, Blue Isle, the Mediatrix/Blue Isle Principals were able to convince at least 217 investors ("Investors") to invest more than $129 million. Of that amount, more than $74 million was fraudulently transferred from Blue Isle to Defendants between September 11, 2016 and March 1, 2019.

3.      Investors were informed, and therefore believed, that their money was being invested in lucrative forex trading. In reality, however, the Mediatrix/Blue Isle Principals were operating an excessive trading/Ponzi scheme through which they pocketed, diverted, or otherwise misappropriated a portion of the Investors' monies, while funneling the remaining monies into trading that, unbeknownst to the Investors, was excessive, costly, and losing in nature and was designed solely to maximize markups, commissions, and other undisclosed fees.

4.      In perpetrating this fraud on Investors, Mediatrix/Blue Isle did not act alone. Defendants enabled, facilitated, and aided and abetted the Mediatrix/Blue Isle fraud. Indeed, the fraud could not have occurred without Defendants' assistance. Specifically, Defendants served as Blue Isle's "prime" or clearing broker and, in that capacity, executed Blue Isle's trades, including through providing "liquidity" and extending leverage and other extraordinary credit. Further, EUK provided technology- and customer-support-type services through its wholly owned subsidiary Equiti US, LLC ("EUS"), and EUS's "Trade Support" personnel, to Blue Isle and the Investors. Those services included supplying the Mediatrix/Blue Isle Principals with access to Metaquotes MetaTrader-4 ("MT4") trading software that generated fraudulent account statements that were emailed to the Mediatrix/Blue Isle Investors. Among other things, these statements misleadingly omitted losing "closed" trades and losing "open" positions, creating the false impression of ever-increasing client account balances and profits.

5.      Defendants did all this for one simple reason: to enrich themselves. Blue Isle was EUK's biggest customer. Blue Isle transferred Investors' funds to, and executed losing trades through, accounts hosted by Defendants, for which Defendants received fees, even though Investors consistently lost money, while Mediatrix/Blue Isle and Defendants hid those losses from Investors in order to induce more investments.

6.      From March 2016 to September 2019, Defendants received more than $74 million in transfers from Blue Isle and claimed more than $12 million in fees, commissions and interest. Defendants, together with Mediatrix/Blue Isle, claimed more than $50 million in fees from the Mediatrix/Blue Isle fraud. Trading under such circumstances could not possibly have been profitable.

7.      Despite all this, Defendants have not yet been held accountable for their role in the fraud. Nor have Investors yet received a dime in compensation for their losses. This action seeks to remedy this injustice.

## II.      PARTIES

### *Plaintiff*

8.      Plaintiff is the Receivership Estate of Blue Isle, whose creditors bring this suit derivatively for the benefit of the Receivership Estate and its creditors.

### *Defendants*

9.      Defendant Equiti Capital UK Ltd. f/k/a Divisa UK Limited is incorporated in the United Kingdom, with its principal place of business located in London. EUK is regulated by the Financial Conduct Authority and is a wholly owned subsidiary of Equiti Group, Ltd. ("EGL"). It holds itself out as a leading financial services provider of forex liquidity.

10.      Defendant Equiti Armenia CJSC f/k/a Divisa AM CJSC is an Armenian corporation wholly owned by EUK, with its principal place of business located in Yerevan, Armenia. EAM holds itself out as carrying out brokerage and other services in the forex and derivatives market for professional and institutional clients mostly for the Commonwealth of Independent States (CIS) and Middle East regions.

## III.      RELEVANT NON-PARTIES

11.      Blue Isle Markets Inc. was formed in St. Vincent and the Grenadines as an International Business Company on or about December 2, 2015. In approximately April 2019, Blue Isle Markets Ltd., a New Zealand corporation, acquired all the assets of Blue Isle Markets Inc.

12.      Mediatrix Capital Inc. was originally formed on or about January 8, 2015, as an International Business Company in Belize. It was later moved to the Bahamas and nominally had its principal place of business there.

13.      The Mediatrix/Blue Isle Principals resided in the United States throughout the time frame Blue Isle transacted with and maintained accounts through Defendants, *i.e.*, 2016 through 2019 (the "Relevant Period").

14.      Michael Young was a resident of Centennial, Colorado in at least 2016, lived in Greenwood Village, Colorado in March 2019, and continued to maintain a house and office in Colorado as of September 2019. As the Co-Founder and Chief Executive Officer of Mediatrix, Young was responsible for sales, marketing, investor relations, and overseeing the business of Mediatrix and was the manager and a member of the board of directors of Mediatrix Capital Fund Ltd. ("Mediatrix Capital Fund"). During the Relevant Period, Mediatrix/Blue Isle business was conducted by Young from, among other places, an office in Colorado. Mediatrix's Due Diligence Questionnaire listed Young as one of three directors and officers of Mediatrix (along with Stewart and Sewall) and, in describing the firm's "governance structure and decision-making process," stated that all three individuals had "absolute decision-making authority." Young was also a one-third owner and Director of Sales for Blue Isle.

15.      Michael Stewart, a resident of Arizona and Puerto Rico, and Bryant Sewall, a Texas resident, together with Young, founded and held various executive-level positions within, and directly or indirectly owned and controlled, Mediatrix and Blue Isle Markets Inc. Stewart also controlled Blue Isle Markets Ltd. at least in part.

16.      The Mediatrix/Blue Isle Principals controlled Blue Isle Markets, Inc. Initially, their nominee, Nancy Ruth Lake of Ontario, held 100% of its shares "in trust" for the Mediatrix/Blue Isle Principals, and "undert[ook] to "carry out the[ir] instructions . . . precisely as instructed by them . . . ." Starting in November 2018, they owned it through Island Technologies, LLC., a Puerto Rico limited liability company of which Young, Stewart, and Sewall were managing members.

17.      Together, the Mediatrix/Blue Isle Principals had absolute decision-making authority over Mediatrix and Blue Isle.

18.      Equiti US, LLC is a Florida limited liability company with its principal place of business in Florida. From October 8, 2014 through August 30, 2021, EUS's sole member was Defendant EUK. Since then, EUS's sole member has been EGL.

## IV.      JURISDICTION AND VENUE

### A.  SUBJECT-MATTER JURISDICTION

19.      This Court has subject matter jurisdiction over this avoidance proceeding pursuant to 28 U.S.C. §§ 754 and 1692 and the Order Appointing Receiver in the proceeding ancillary to this case, *SEC v. Mediatrix Capital Inc. et al.*, No. 1:19-cv-02594-RM, Doc. No. 153 ("SEC Action").[1]

20.      This Court has jurisdiction over this proceeding under 28 U.S.C. § 1331 because the proceeding is ancillary to the case *SEC v. Mediatrix Capital Inc. et al.*, presently pending before the United States District Court for the District of Colorado as Case No. 1:19-cv-02594-RM pursuant to, 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa.

---

[1] References to ECF or Docket entries herein refer to filing in the SEC Action unless specified otherwise.

21.     This Court further has subject matter jurisdiction over this avoidance proceeding pursuant to 28 U.S.C. § 1332 because the parties are citizens of a state and citizens of foreign states and the amount in controversy exceeds $75,000.

22.     Plaintiff's claims are ancillary to the SEC's enforcement action, which involves a federal question, and is therefore "part of the same case or controversy" as the federal question claim, 28 U.S.C. § 1367, and is necessary to enforce judgments in the original case.

B. PERSONAL JURISDICTION

23.     This Court has personal jurisdiction over Defendants on multiple grounds.

24.     As alleged elsewhere herein, Mediatrix/Blue Isle and their principals orchestrated a fraudulent excessive trading/Ponzi scheme pursuant to which they transferred vast sums to Defendants. When the SEC filed suit to hold Mediatrix/Blue Isle and the Mediatrix/Blue Isle Principals liable, Defendants voluntarily came to this Court and engaged in active, substantive litigation that included repeatedly asking the Court to grant them affirmative relief in their favor. Early on, the Court ordered accounts maintained by Defendants to be frozen and Defendants appeared to acknowledge the Court's jurisdiction.

25.     Years later, after the Court's appointment of a Receiver, Defendants' active participation in substantive litigation in this Court continued. Indeed, Defendants negotiated and consented to an order from the Court that required them to transfer nearly $12 million to the Receiver but allowed them to keep more than $1.7 million, effectively finding personal jurisdiction existed. *See* SEC Action, ECF # 133 and 134. Defendants' actions, and Plaintiff's claims in this matter, all arise from and relate to the fraudulent scheme that is the subject of the SEC Action and Receivership. In total, Defendants filed ten documents with the Court between October 24, 2019

and December 15, 2021, ultimately succeeding in persuading the Court to enter an order allowing them to retain significant funds that would otherwise be part of the Receivership estate. SEC Action, ECF # 43, 44, 48, 53, 96, 117, 131, 132, 296, and 297. Quite simply, it is neither unfair nor unexpected for this Court to exercise specific jurisdiction over Defendants, who could reasonably foresee being haled into court in Colorado.

### *Minimum Contacts with the Forum—Related Pre-Receivership Litigation*

26.     *First*, Defendants have purposely availed themselves of the benefits of this forum and thus similarly have sufficient minimum contacts to satisfy the Due Process Clause of the Constitution and Colorado's long-arm statute.

27.     On September 12, 2019, the SEC brought the SEC Action on an emergency basis against the Mediatrix/Blue Isle Principals, Mediatrix, Blue Isle, and other parties seeking a temporary restraining order ("TRO") that included an asset freeze encompassing Blue Isle's trading accounts with EUK and EAM. *See* SEC Action, ECF # 1.

28.     On September 13, 2019, the Court issued its TRO. SEC Action, ECF # 10. In particular, the Court found that it had jurisdiction over the subject matter of the action, that the SEC had shown a likelihood of success on the merits "[f]or purposes of freezing assets," and that "[t]here is good cause to believe that, unless restrained and enjoined by order of this Court, the Defendants and Relief Defendants will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil money penalties in this action, and that unless restrained Defendants may solicit additional funds from investors." *Id.* at 2-3.

29.      Accordingly, among other things, the Court froze Blue Isle's accounts at EUK and EAM. *Id.* at 5, Schedule A. Even further to the point, the Court ordered that Defendants and any of their respective officers, directors, successors, subsidiaries, affiliates, agents, and persons in active concert or participation "hold and retain within their control and prohibit the withdrawal, removal, transfer or other disposal of" Blue Isle's funds or assets in EUK and EAM accounts. *Id.* at 6. On October 10, 2019, the Court entered a preliminary injunction order extending its previously imposed TRO, finding that the SEC had established a "prima facie case for each of the violations," and that there was a "strong likelihood that [the SEC] will prevail at trial on the merits." SEC Action, ECF # 35 ("PI Order"). This order continued to encompass Blue Isle's accounts at EUK and EAM.

30.      Defendants received notice of or otherwise had discussions with the SEC regarding the PI Order and its effect on Blue Isle's accounts at EUK and EAM. *See generally, e.g.*, SEC Action, ECF # 27 (discussing communications with EUK and EAM). Thereafter, on October 24, 2019, attorneys located in Colorado, Missouri, and New York filed an appearance on behalf of Defendants in the SEC Action. SEC Action, ECF # 42.

31.      Thereafter, Defendants (collectively referring to themselves as "Equiti") proceeded to voluntarily appear before the Court, substantively litigate in the SEC Action, and seek affirmative relief from the Court's Orders. Defendants did this to establish their entitlement to assets held in Blue Isle's brokerage accounts maintained with Defendants and alleged offsets against those assets to which they argued EAM was entitled under Defendants' July 25, 2019 Trading Accounts Set-Off Agreement ("Set-Off Agreement") with Blue Isle.

32.     While Defendants repeatedly stated in generalized disclaimers that they did not consent to the Court's jurisdiction, they repeatedly appeared before and sought relief from this Court so that their conduct operated as consent to this Court's jurisdiction in connection not only with the SEC Action but also this ancillary proceeding.

33.     More specifically, on October 24, 2019, Blue Isle, Mediatrix, and the Mediatrix/Blue Isle Principals filed a motion in the SEC Action stating that Blue Isle's trading accounts held at EUK and EAM—which were frozen by the TRO Order—contained open positions in foreign currencies and precious metals that were at risk of market loss if not liquidated or hedged, that the Court had granted the parties' previous motion to permit liquidation of these market exposures, but that Defendants had not complied with the liquidation instructions.[2] Blue Isle, Mediatrix, and the Mediatrix/Blue Isle Principals therefore requested that the Court order Defendants to close all market exposures and convert the same to U.S. Dollars. SEC Action, ECF # 41 (the "Liquidation Motion").

34.     Although Defendants were non-parties, they enthusiastically jumped into the SEC Action to protect their purported interests and to seek relief from the Court. Indeed, the very same day the Liquidation Motion was filed, Defendants filed a "Notice to the Court" asking permission to file "a comprehensive explanation of [their] position[.]" SEC Action, ECF # 43. Five days later, though they had not received the "permission" they sought, Defendants filed a Response to the Liquidation Motion. SEC Action, ECF # 44. That Response asked the Court to deny the request for liquidation and instead enforce Defendants' Set-Off Agreement. *See id.* at 3, 10-11. This "setoff"

---

[2] The movants attached an email from Defendant EUK's agent, Gary Dennison, stating "Do NOT close out any positions until authorized by Michael Ayers [Defendant EUK's Chief Operating Officer]." SEC Action, ECF # 41, Ex. 2.

option would allow EUK to keep certain proceeds from the remaining positions in Blue Isle's accounts.[3] Defendants argued that "these are the only lawful and equitable resolutions of the issues raised by" the Liquidation Motion. *Id.* at 3. They also stressed to the Court that "Equiti . . . will be harmed if the Court grants the Liquidation Motion." *Id.* at 8.

35.     In support of their position, Defendants noted that they had been cooperating with the SEC's lawyers in Denver; they described such cooperation as "extensive, [and] voluntary." SEC Action, ECF #53 at 2. That cooperation included offering for Equiti's "COO [to] travel to Denver from London" and to have "an Equiti US technical support employee travel from Florida to Denver to testify at the [SEC's] preliminary injunction hearing." SEC Action, ECF # 44 at 4-5.[4]

36.     Roughly two weeks after filing their Response, Defendants filed a "Supplemental Response" with the Court. SEC Action, ECF # 48. The Supplemental Response identified how Defendants were monitoring repeated logins to Blue Isle's account. More importantly, the Supplemental Response attached a proposed order that Defendants asked the Court to enter. *Id.*

37.     In response, the SEC accused Defendants of "hold[ing] the close-out of the positions hostage pending favorable resolution of their off-set claims," SEC Action, ECF # 50 at

---

[3] The Set-Off Agreement provided, among other things, that EUK and EAM "shall be entitled (but not obliged), at their absolute discretion, and without the need to notify Blue Isle to set-off amounts held in any of Blue Isle' trading accounts with any Equiti Group member towards the full or partial settlement of any payment obligations owing by Blue Isle to any Equiti Group member."

[4] A log of communications potentially to be used at the trial of Sewall and Stewart before Judge Martinez of this Court is replete with references to communications involving Dennison (*i.e.*, an "Equiti representative") by which it appears that he has been interviewed repeatedly by FBI agents involved in the prosecution of Stewart and Sewall by the U.S. Attorney's Office for the District of Colorado. *See U.S. v. Stewart, et al.*, ECF # 115-1 (Case No. 1:21-cr-00034-WJM).

13; expressed concern about Defendants' unclean hands, noting that the "tools supplied by Equiti" had enabled Blue Isle to "effectuate their fraud" and sought permission from the court to investigate the setoff claims asserted by Defendants, *id.* at 14-17; and accused Defendants of attempting to "immediately grab what is now approximately in $4.1 million" of defrauded Investor funds, SEC Action, ECF # 127 at 6.

38.     Defendants later filed a 118-page reply (including exhibits) that doubled down on their request for the Court to grant them affirmative relief. SEC Action, ECF # 53. Among other things, Defendants denied they engaged in wrongdoing, contending in effect they were unaware "of the defendants' alleged wrongdoing" until recently and that the alleged fraud was not "open and notorious." SEC Action, ECF # 53 at 3-4. Defendants urged the Court to protect their interests, arguing that "[a] court of law should recognize that a legal risk imposed upon a non-party is a far greater harm than a potential dissipation in value of a brokerage account" and that "[t]he interests of justice in this case should compel this Court to deny the Liquidation Motion and enter Equiti's proposed order instead, or simply deny the Liquidation Motion." SEC Action, ECF # 53 at 16.

39.     On January 3, 2020, Defendants again filed a proposed order they advocated the Court enter. SEC Action, ECF # 96. Five months later, Defendants filed a motion with the Court to "expedite resolution" of the affirmative and defensive positions the entities had made before the Court in substantive litigation over the preceding year. SEC Action, ECF # 117.

40.     Ultimately, on June 25, 2020, the Court ordered Defendants to liquidate all assets held in the Blue Isle accounts and "to preserve and hold" the resulting proceeds. SEC Action, ECF # 133, 134. These orders impliedly, and necessarily, found that the Court had personal jurisdiction over Defendants.

*Minimum Contacts with the Forum—Related Receivership Litigation*

41.      **Second**, On September 3, 2020, the SEC filed an emergency motion to appoint a receiver "to marshal and administer assets subject to the asset freeze orders entered by the Court." SEC Action, ECF # 149 at 1 The Court granted that motion via its September 11, 2020 order ("Receivership Order"). SEC Action, ECF # 153.[5]

42.      In its Receivership Order, the Court granted the Receiver exclusive authority to pursue fraudulent transfer claims on behalf of the Receivership Estate. Specifically, the Court found that the appointment of the Receiver in this action was "necessary and appropriate for the purposes of marshalling and preserving all assets of the Defendants ('Receivership Assets') . . . that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; (c) were fraudulently transferred by the Defendants; and/or (d) may otherwise be includable as assets of the estate of the Defendants (collectively, the 'Recoverable Assets')." SEC Action, ECF # 153 at 1.

43.      The Court defined "Receivership Property" and the "Receivership Estate" to include the Recoverable Assets, and granted the Receiver authority to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property . . . to take any action, which prior to the entry of the [Receivership] Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Defendants . . . to take such action as necessary and appropriate for the preservation of Receivership or to prevent the

---

[5] The initial receiver was Brick Kane of Robb Evans & Associates LLC, who passed away during the tenure of his appointment. Accordingly, on October 20, 2021, the Court appointed Mark Conlan of Gibbons P.C. to serve as substitute receiver "under the terms and conditions of the existing [Receivership Order]." *See* SEC Action, ECF # 283, 284.

dissipation or concealment of Receivership Property . . . and to bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver." *Id.* at ¶ 4.

44.      On December 15, 2021, the SEC filed a motion to modify the asset freeze that encompassed Blue Isle's accounts at EUK and EAM. SEC Action, ECF # 295. The motion noted that EUK held $12,939,858.47 in "account(s) in the name of Defendant Blue Isle Markets Inc." and that "Blue Isle also holds account(s) at [EAM] with a negative balance of" $3,513,446.82. *Id.* at 2. The motion further noted that "Equiti asserts that it has a contractual right to use funds held in Blue Isle's Equiti UK account to offset the loss in Blue Isle's Equiti AM account." *Id.*

45.      To resolve the dispute, the SEC asked the Court to "enter an order directing Equiti to transfer to the Court appointed substitute receiver . . . the $12,939,858.47 held in Blue Isle's Equiti UK account, less an amount equal to one-half of the $3,513,446.82 negative balance in Blue Isle's Equiti AM account." *Id.* at 2-3.

46.      Following more than two years of Defendants' active, substantive participation in the SEC Action and the Court's appointment of a Receiver with control of Blue Isle's EUK and EAM accounts, Defendants filed in this Court a "Consent to Relief." SEC Action, ECF # 296-297. Through this filing, Defendants consented to the relief the SEC sought in its motion—i.e., that the Court order Defendants to transfer the Receiver nearly $12 million but allow Defendants to retain nearly $1.8 million. *See* SEC Action, ECF # 297 at 2.

47.      In filing their "Consent to Relief," which was the product of a negotiation and settlement between and among the SEC, the Receiver, and Defendants, Defendants acted similarly to a creditor pursuing a proof of claim in bankruptcy, thereby consenting to the Court's personal

jurisdiction over them. Defendants further deliberately established additional contacts with Colorado, and this Court gave Defendants a considerable benefit from activities that took place within Colorado, thereby purposely availing themselves of the benefits of this forum and the Court's jurisdiction.

*Minimum Contacts with the United States Due to Nationwide Service of Process*

44.     *Third*, the Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k) and 28 U.S.C. §§ 754, 1692, which authorize nationwide service of process.

48.     The Receiver has registered the Receivership Order in multiple federal judicial districts, including the District of Colorado on October 4, 2022, the Middle District of Florida on October 28, 2021, the Eastern District of Texas on November 6, 2020, the Northern District of Texas on September 18, 2020, the District of Arizona on September 18, 2020, and the District of Puerto Rico on September 22, 2020.

49.     The claims Plaintiff now pursues are owned by the Receivership Estate and will benefit its creditors pro rata. Further to this point, all of Investors' losses arise from or relate to the excessive trading/Ponzi scheme that Defendants aided and abetted (including through their U.S.-based agent, Dennison, and subsidiary EUS).

50.     In addition to the Receivership and excessive trading/Ponzi scheme, Defendants have other minimum contacts with the United States to comply with the Due Process Clause of the Constitution. For example, Defendants' U.S.-based agent, Dennison, communicated with at least Investor B.S. (in addition to the Colorado-based Investor described above) in October 2017 and May 2019 (phone calls and emails).

51.     Next, during the Relevant Period, Defendant EUK had a wholly owned subsidiary, EUS, that is a Florida limited liability company with its principal place of business in Jupiter, Florida.

52.     Defendants collectively used EUS to service their customers, including Mediatrix/Blue Isle, while knowing that the Mediatrix/Blue Isle Principals and many of the Investors resided in the U.S. (including in Colorado). EUS provided certain technology services relating to the MT4 and customer support services to Defendants and their customers.

53.     Further, Defendants entered into the Set-Off Agreement that was signed between and among Michael Ayres of EUK, Artak Nahapetyan of EAM and Michael Stewart (who resided in Arizona and Puerto Rico) of Blue Isle. As described in Paragraphs 14-16, *supra,* Blue Isle was at all relevant times owned by United States residents and operated in the United States, including in Colorado. Defendants attempted to enforce the Set-Off Agreement in proceedings before this Court. *See* Paragraph 31, *supra.*

54.     Likewise, on February 17, 2017 and May 22, 2018, Defendants entered into successive Service Level Agreements under which under at least the later agreement, EUK agreed to perform services for EAM, including assisting in trade execution and confirmation, but also regarding IT Support ("[p]roviding connectivity, software and hardware support services . . . including the correct operation of the MT4 platform") which service necessarily would be, and were, performed by EUS. Defendants filed the May 22, 2018 Service Level Agreement with the U.S. District Court for the District of Colorado as an exhibit to one of their pleadings (SEC Action, ECF # 53-3).

55.     Therefore, Defendants maintained direct or indirect contractual relationships through which Defendants reached out beyond the United Kingdom and Armenia and created continuing relationships and obligations regarding Florida and Colorado and Defendants therefore both had significant courses of dealing, including with both EUS and Blue Isle, through the Service Level Agreements and the Set-Off Agreement.

56.     Plaintiff's claims arise in part out of certain of these agreements and arrangements since EUS's services, including the provision of technology that enabled both the fraudulent trading, and concealment of the results of the trading, via account statement transmitted by EUS's MT4 system, were a necessary and critical component of the scheme through which the Fraudulent Transfers were made.

57.     EUS, on behalf of Defendants, caused to be distributed, or distributed, account statements for Blue Isle's coverage accounts to Michael Stewart, whom Defendants knew was a resident of Arizona and Puerto Rico.

58.     Relatedly, Defendant EUS's Trade Support personnel acting at the direction and for the benefit of Defendants forwarded fraudulent account statements directly to at least Investors A.L. (California) on December 27, 2017 and December 30, 2018, and D.R. (Texas) on April 19-23, 2018, and on May 1, 2018, at the request of Michael Stewart sent a link to the statements of K.H. (Colorado), which Stewart forwarded to K.H.

59.     In addition, EUK relied upon and delegated authority to a Florida-based person (Dennison), EUS's then-CEO, to manage and act as the primary account representative of its Blue Isle account.

60.     EUK personnel also supervised and otherwise directed many aspects of EUS' business. Indeed between 2016 and 2018, Mushegh Tovmasyan, EUK's then-CEO, supervised Florida resident Dennison, during which time they spoke on a daily basis, often with respect to Blue Isle, EUK's largest customer account. Dennison thereafter was supervised by Iskandar Najjar, an EUK board member. On information and belief, EUK's representatives, including Tovmasyan and Najjar, also periodically visited EUS's Florida office.

61.     Finally, the Mediatrix/Blue Isle scheme injured at least 149 Investors who resided in the United States, including Investors residing in Colorado (at least eleven), California (at least 38), Arizona (at least eight), Florida (at least nine), Illinois (at least seven), Indiana (at least three), New Jersey (at least four), New Mexico (at least six), Texas (at least ten), and Washington (at least seven), in addition to Investors residing in Arkansas, Connecticut, Georgia, Hawaii, Maryland, Massachusetts, Minnesota, Mississippi, New York, North Carolina, Ohio, Puerto Rico, South Dakota, Tennessee, Virginia, Wisconsin and Washington, D.C.

### Minimum Contacts with the Forum—Business Dealings

62.     *Lastly*, Defendants have sufficient minimum contacts with the forum to comport with the Due Process Clause of the U.S. Constitution and Colorado's long-arm statute. Among other things, Defendants directed their business dealings toward Colorado.

63.     For example, Defendants' agent, Gary Dennison—who served as EUS's chief executive officer and Defendants' client relationship manager for Blue Isle—frequently communicated with Mediatrix CEO and Blue Isle owner and Director of Sales Michael Young, a Colorado resident, between 2016 and September 2019 related to Blue Isle's trading relationship with EUK and EAM. Further, Dennison had communications with actual or prospective

Mediatrix/Blue Isle Investors residing in Colorado, including a phone call with Investor S.B. on about November 2, 2017 to address due diligence questions he had about Blue Isle's relationship with Defendants including, among other things, the existence of Blue Isle's accounts, confirmation of its high volume trading, and its status as a longtime customer in good standing.

64.     And Mario Camera, EUK's Global Head of Legal & Compliance communicated with another Mediatrix/Blue Isle Investor in Colorado, Investor R.P., via email and through phone calls about R.P.'s attempts to obtain a refund from EUK as to his Mediatrix/Blue Isle investment between July and September 2019.

### C. VENUE

65.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action (*i.e.*, the Receivership Estate) is situated in Colorado and administered in this District. Further, the Receivership Estate on whose behalf certain creditor pursue this action is based in Colorado and subject to this Court's jurisdiction and oversight.

### V.     PROCEDURAL HISTORY

66.     The SEC's complaint against Mediatrix / Blue Isle and its principals was filed in September 2019. At present, discovery is ongoing, no trial date has been set and no judgment or order has been entered against Mediatrix / Blue Isle as of the filing of this pleading.

67.     Whereas in October 2019 the Court entered its PI Order, it was not until September 2020 when the Court first entered its Receivership Order that effectively ousted the "zombie" Mediatrix / Blue Isle Principals from control of Mediatrix/Blue Isle.

68.     Pursuant the Receivership Order, the Court granted the Receiver exclusive authority to pursue fraudulent transfer claims on behalf of the Receivership Estate, enjoined others from doing so, and tolled any applicable statute of limitations for such claims.

69.     In a report filed on May 1, 2023 (SEC Action, ECF # 423), the Receiver stated that after conducting diligence, the "Receiver has decided not to pursue litigation against Equiti." On information and belief, the Receiver's determination was for economic reasons, not substantive as to the merits of the fraudulent transfer claims against Defendants.

70.     Simultaneously herewith, Plaintiffs filed a Motion for Leave to Lift the Receivership Stay to file the instant complaint in the SEC Action. *See* SEC Action ECF # 461. As noted in Plaintiffs' Unopposed Motion to Lift the Receivership Stay's certificate of conferral, the SEC, the Receiver, and all defendants and relief defendants in that action also did not oppose the motion. *Id.*, at 1-2.

71.     This Complaint was filed pending the Court's ruling on the Motion in the SEC Action.

## VI.     FACTUAL BACKGROUND

### A. BLUE ISLE MADE FRAUDULENT TRANSFERS TO DEFENDANTS

72.     Beginning in 2016, the Mediatrix/Blue Isle Principals began soliciting Investors to invest in the Mediatrix FX Fund, through which their accounts, would be managed individually ("Managed Accounts"), and/or in the Mediatrix Capital Fund, including investments through self-directed IRA accounts.

73.     Mediatrix told the Mediatrix/Blue Isle Investors that their money would be used to trade in forex according to Mediatrix's purported highly successful algorithmic trading strategy.

74.     From September 2016 through September 2019 ("Relevant Period"), Mediatrix/Blue Isle raised more than $129 million from Investors through the solicitation of Investors.

75.     At the direction of the Mediatrix/Blue Isle Principals, Investors deposited their funds into accounts associated with an "independent" broker called Blue Isle. Investors were then informed that their monies would then be traded through accounts held at another broker, called a "prime broker," *i.e.*, Defendants EUK and EAM. Mediatrix's use of multiple brokers, each of which charged its own fees, led to a very expensive cost structure.

76.     In furtherance of their fraudulent aims, Mediatrix/Blue Isle transferred more than $74 million to Defendants between September 2016 and March 2019, as follows (the "Fraudulent Transfers") during which entire time Mediatrix/Blue Isle was engaged in an excessive trading scheme that included in part, misappropriation of investor funds, involving Ponzi payments:

|   | Book Date | Blue Isle Bank Acct. # (last 4) | To | EAM/EUK Bank | EAM/EUK Bank Acct. # (last 4) | Amount Transferred USD* |
|---|-----------|--------------------------------|-----|--------------|------------------------------|------------------------|
| 1 | 9/12/2016 | 3352 | EAM | CONVERSE | 0103 | 53,093 |
| 2 | 9/15/2016 | 9312 | EAM | CONVERSE | 0301 | 200,000 |
| 3 | 9/23/2016 | 3352 | EAM | CONVERSE | 0103 | 53,658 |
| 4 | 9/23/2016 | 9312 | EAM | CONVERSE | 0301 | 200,000 |
| 5 | 10/4/2016 | 9312 | EAM | CONVERSE | 0301 | 375,000 |
| 6 | 10/20/2016 | 9312 | EAM | CONVERSE | 0301 | 1,050,000 |
| 7 | 10/21/2016 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 8 | 10/25/2016 | 9312 | EAM | CONVERSE | 0301 | 40,000 |
| 9 | 10/26/2016 | 9312 | EAM | CONVERSE | 0301 | 200,000 |
| 10 | 10/27/2016 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 11 | 11/1/2016 | 9312 | EAM | CONVERSE | 0301 | 50,000 |
| 12 | 11/2/2016 | 9312 | EAM | CONVERSE | 0301 | 50,000 |
| 13 | 11/7/2016 | 9312 | EAM | CONVERSE | 0301 | 150,000 |
| 14 | 11/9/2016 | 9312 | EAM | CONVERSE | 0301 | 500,000 |
| 15 | 11/11/2016 | 9312 | EAM | CONVERSE | 0301 | 150,000 |
| 16 | 11/16/2016 | 9312 | EAM | CONVERSE | 0301 | 200,000 |
| 17 | 11/21/2016 | 9312 | EAM | CONVERSE | 0301 | 225,000 |

| 18 | 11/22/2016 | 3352 | EAM | CONVERSE | 0103 | 97,451 |
|---|---|---|---|---|---|---|
| 19 | 11/28/2016 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| 20 | 12/8/2016 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 21 | 12/12/2016 | 9312 | EAM | CONVERSE | 0301 | 50,000 |
| 22 | 12/15/2016 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 23 | 12/20/2016 | 9312 | EAM | CONVERSE | 0301 | 300,000 |
| 24 | 12/21/2016 | 9312 | EAM | CONVERSE | 0301 | 500,000 |
| 25 | 12/27/2016 | 9312 | EAM | CONVERSE | 0301 | 50,000 |
| 26 | 12/30/2016 | 9312 | EAM | CONVERSE | 0301 | 340,000 |
| 27 | 1/2/2017 | 9312 | EAM | CONVERSE | 0301 | 275,000 |
| 28 | 1/3/2017 | 9312 | EAM | CONVERSE | 0301 | 200,000 |
| 29 | 1/11/2017 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 30 | 1/18/2017 | 9312 | EAM | CONVERSE | 0301 | 500,000 |
| 31 | 1/20/2017 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| 32 | 1/25/2017 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| 33 | 1/30/2017 | 9312 | EAM | CONVERSE | 0301 | 1,150,000 |
| 34 | 2/7/2017 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 35 | 2/8/2017 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 36 | 2/17/2017 | 9312 | EAM | CONVERSE | 0304 | 107,157 |
| 37 | 2/17/2017 | 9312 | EAM | CONVERSE | 0301 | 182,000 |
| 38 | 2/21/2017 | 9312 | EAM | CONVERSE | 0301 | 650,000 |
| 39 | 3/2/2017 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| 40 | 3/7/2017 | 3352 | EAM | CONVERSE | 0103 | 269,344 |
| 41 | 3/9/2017 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| 42 | 3/10/2017 | 9312 | EAM | CONVERSE | 0301 | 150,000 |
| 43 | 3/15/2017 | 9312 | EAM | CONVERSE | 0301 | 350,000 |
| 44 | 3/17/2017 | 3352 | EAM | CONVERSE | 0103 | 37,054 |
| 45 | 3/17/2017 | 9312 | EAM | CONVERSE | 0301 | 700,000 |
| 46 | 3/24/2017 | 9312 | EAM | CONVERSE | 0301 | 100,000 |
| 47 | 3/30/2017 | 9312 | EAM | CONVERSE | 0301 | 300,000 |
| 48 | 5/10/2017 | 9312 | EAM | CONVERSE | 0301 | 140,000 |
| 49 | 5/19/2017 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| 50 | 5/23/2017 | 9312 | EAM | CONVERSE | 0301 | 750,000 |
| 51 | 5/26/2017 | 9312 | EAM | CONVERSE | 0301 | 300,000 |
| 52 | 6/19/2017 | 9312 | EAM | CONVERSE | 0301 | 268,000 |
| 53 | 6/20/2017 | 9312 | EAM | CONVERSE | 0301 | 43,000 |
| 54 | 6/27/2017 | 9312 | EAM | CONVERSE | 0301 | 300,000 |
| 55 | 7/27/2017 | 9312 | EAM | CONVERSE | 0301 | 250,000 |
| | | | | | **Total Transferred to EAM** | **14,055,756** |
| 56 | 8/16/2017 | 9312 | EUK | WELLS FARGO | 0968 | 700,000 |
| 57 | 8/23/2017 | 9312 | EUK | WELLS FARGO | 0968 | 900,000 |
| 58 | 8/23/2017 | 9312 | EUK | WELLS FARGO | 0968 | 4,000,000 |

| 59 | 8/23/2017 | 9312 | EUK | WELLS FARGO | 0968 | 4,000,000 |
|----|-----------|------|-----|-------------|------|-----------|
| 60 | 8/24/2017 | 9312 | EUK | WELLS FARGO | 0968 | 1,000,000 |
| 61 | 9/11/2017 | 9312 | EUK | WELLS FARGO | 0968 | 1,500,000 |
| 62 | 9/13/2017 | 3352 | EUK | WELLS FARGO | 0966 | 259,206 |
| 63 | 9/29/2017 | 9312 | EUK | WELLS FARGO | 0968 | 250,000 |
| 64 | 10/3/2017 | 9312 | EUK | WELLS FARGO | 0968 | 900,000 |
| 65 | 10/5/2017 | 3352 | EUK | WELLS FARGO | 0966 | 183,935 |
| 66 | 10/5/2017 | 9312 | EUK | WELLS FARGO | 0966 | 184,731 |
| 67 | 10/5/2017 | 9312 | EUK | WELLS FARGO | 0968 | 800,000 |
| 68 | 10/19/2017 | 9312 | EUK | WELLS FARGO | 0968 | 2,000,000 |
| 69 | 11/22/2017 | 9312 | EUK | WELLS FARGO | 0968 | 2,507,000 |
| 70 | 12/7/2017 | 9312 | EUK | WELLS FARGO | 0968 | 3,000,000 |
| 71 | 1/3/2018 | 3192 | EUK | WELLS FARGO | 0967 | 422,221 |
| 72 | 3/9/2018 | 3352 | EUK | WELLS FARGO | 0966 | 268,683 |
| 73 | 4/3/2018 | 9312 | EUK | WELLS FARGO | 0968 | 1,000,000 |
| 74 | 4/4/2018 | 9312 | EUK | WELLS FARGO | 0968 | 500,000 |
| 75 | 6/20/2018 | 3272 | EUK | WELLS FARGO | 0968 | 1,000,050 |
| 76 | 6/29/2018 | 3272 | EUK | WELLS FARGO | 0968 | 3,400,000 |
| 77 | 7/25/2018 | 3272 | EUK | WELLS FARGO | 0968 | 544,000 |
| 78 | 7/27/2018 | 3272 | EUK | WELLS FARGO | 0968 | 1,000,000 |
| 79 | 8/7/2018 | 3272 | EUK | WELLS FARGO | 0968 | 3,000,065 |
| 80 | 10/12/2018 | 3272 | EUK | WELLS FARGO | 0968 | 350,000 |
| 81 | 11/2/2018 | 3272 | EUK | WELLS FARGO | 0968 | 500,000 |
| 82 | 11/7/2018 | 3272 | EUK | WELLS FARGO | 0968 | 4,000,000 |
| 83 | 11/8/2018 | 3272 | EUK | WELLS FARGO | 0968 | 4,000,000 |
| 84 | 11/9/2018 | 3272 | EUK | WELLS FARGO | 0968 | 2,000,000 |
| 85 | 1/10/2019 | 3272 | EUK | WELLS FARGO | 0968 | 2,000,000 |
| 86 | 1/24/2019 | 3272 | EUK | WELLS FARGO | 0968 | 2,000,000 |
| 87 | 3/1/2019 | 3272 | EUK | WELLS FARGO | 0968 | 2,000,000 |
| 88 | 3/1/2019 | 3272 | EUK | WELLS FARGO | 0968 | 10,000,000 |
| | | | | | **Total Transferred to EUK $ 60,169,891** | |
| | | | | | **TOTAL TRANSFERRED TO EAM & EUK $ 74,225,647** | |

\* Transfers in currencies other than USD converted to USD using contemporaneous exchange rates.

The remaining funds were immediately misappropriated by the Mediatrix/Blue Isle Principals' diverting them to themselves and various non-trading entities they owned and controlled, or otherwise were improperly spent, including on fees for sales representatives, Ponzi-payments to other Investors or other expenses to perpetuate the fraud.

78.      Each of the Fraudulent Transfers were sent from one of Blue Isle's bank accounts at Ceska Sporitelna, Global Fidelity Bank, ANZ Bank New Zealand Limited or Kiwibank Ltd. ("Blue Isle Bank Accounts"). EAM received Fraudulent Transfers sent by Mediatrix/Blue Isle into one of three bank accounts in its name held at Converse Bank. EUK received Fraudulent Transfers sent by Mediatrix/Blue Isle into one of three bank accounts held in its name at Wells Fargo.

79.      Funds received by Defendants from Mediatrix/Blue Isle from the Fraudulent Transfers were held in non-segregated bank accounts in the name of EUK and EAM.

80.      Defendants had full control and dominion over funds received from Mediatrix/Blue Isle. Onboarding agreements executed by Defendants and Blue Isle—including a Client Terms and Conditions Agreement, Professional Client Agreement, and Title Transfer Agreement—provided that EAM and EUK would treat transfers of money by Blue Isle to Defendants as a title transfer of "full ownership" to Defendants.

81.      Upon receipt of funds from Mediatrix/Blue Isle, Defendants had control and discretion on use of the funds, including the ability to transfer the funds to Defendants' own liquidity providers or other third parties.

82.      Additionally, after receiving the Fraudulent Transfers from Mediatrix/Blue Isle, EUK and EAM extracted more than $12 million for themselves in fees and commissions from Mediatrix/Blue Isle's fraudulent trading scheme (described more fully below). Defendants had full ownership and exercised exclusive dominion and control over the fees and commissions extracted from Mediatrix/Blue Isle's fraudulent trading.

**B.  MEDIATRIX/BLUE ISLE, ACTING WITH FRAUDULENT INTENT, ENRICHED ITS PRINCIPALS BY ENGAGING IN AN EXCESSIVE TRADING/PONZI SCHEME**

83.      As further described below, from 2016 to 2019, Mediatrix/Blue Isle operated an excessive trading/Ponzi scheme that employed multiple forms of deception and dishonesty to achieve its aims of enriching the Mediatrix/Blue Isle Principals. Mediatrix/Blue Isle used a variety of misrepresentations, primarily regarding the high performance and low risk of its algorithmic forex trading program, to entice and induce Investors to invest. To enrich themselves, the Mediatrix/Blue Isle Principals used part of the monies deposited by Investors to engage in excessive trading, through brokerage accounts held though Defendants, in a manner designed, and with the intent to, maximize fees and commission revenue for Mediatrix/Blue Isle and with acute indifference as to investor losses. They used the remaining portion of the monies to make Ponzi payments to certain Investors or to spend it for other purposes, including simply misappropriating it. Thereafter, the scheme was "covered up" through the dissemination of account statements that consistently and intentionally misrepresented the value of Investors' accounts and the profitability of Mediatrix/Blue Isle's trading, thereby inducing its clients to remain invested or to invest additional monies.

*Excessive Trading*

84.      The first aspect of the Mediatrix/Blue Isle fraudulent scheme consisted of the excessive trading of omnibus coverage accounts, funded by investor deposits, over which Stewart and/or Sewall exercised complete and exclusive control, for the purpose of generating renumeration for Mediatrix/Blue Isle and Defendants, without regard for the investment or trading objectives of Investors.

85.     Such excessive trading operated as a stand-alone fraud but was also inconsistent with the Limited Power of Attorney ("LPOA") agreements used by Mediatrix/Blue Isle to onboard and induce Managed Account Investors to invest. The LPOA stated that Mediatrix "will not churn the Account in order to receive higher commissions and fees."

86.     The excessive trading aspect of the scheme may be described as follows. After initially being deposited into one of Blue Isle's bank accounts, the majority of Investors' funds was conveyed to, and commingled in, EUK and EAM bank accounts maintained at Wells Fargo and Converse Bank, respectively. EUK and EAM at all times relevant exercised control over the bank accounts holding investor funds and funds were only released to Blue Isle pursuant to formal withdrawal requests.

87.     After receiving the funds in their bank accounts, EUK and EAM credited six pooled margin trading accounts that EUK and EAM named "Blue Isle Markets" or "Blue Isle Markets Inc." (EAM accounts ending in 013, 021 and 023) and EUK accounts ending in 160, 166 and 167) ("Coverage Accounts"), where the funds were used to engage in forex trading. Defendants were characterized as Blue Isle's "prime brokers." Investors were not provided access to the Coverage Accounts, where the actual trading took place and the assets were held.

88.     Blue Isle used a Multi-Account Manager ("MAM") plugin on its MT4 system.[6] This plugin allowed Blue Isle to create "master accounts," in which the Mediatrix/Blue Isle Principals (primarily Sewall) could place trade orders. Each master account was linked to one of the Coverage Accounts, in which trade orders from the master accounts were aggregated and executed. Any profit or loss from closed trades was then allocated to individual investor sub-

---

[6] Blue Isle's MAM plugin was supplied by third party Panda Trading Systems.

accounts assigned to the various master accounts. This system allowed the Mediatrix/Blue Isle Principals to trade multiple investor sub-accounts via a single master account. The trading of Investors' monies held in the Coverage Accounts was done in an undifferentiated fashion without respect to the ownership of those funds or the strategy of any particular Investor. Specifically, in implementing one combined investment strategy, the Mediatrix/Blue Isle Principals did not trade specific Investors' accounts according to their individualized trading objectives, suitability, or desired risk profile. The Blue Isle Principals did not customize trades for specific Investors by limiting asset classes, holding duration, or other technical parameters.

89.     Forex trades placed on behalf of Investors were subject to the following fees and charges:

- EUK and EAM charged commissions on each trade in the Coverage Accounts.

- Rollover / Swap fees ("R/O Swap fees") were charged on Blue Isle's positions in the Coverage Accounts that were held open overnight.

- On information and belief, EUK charged a spread markup on the prices it gave to Blue Isle.

- In turn, Blue Isle charged an additional spread markup on the prices given to Mediatrix regarding orders placed in the master accounts.

- EUS provided Blue Isle with daily markup profit reports identifying the markup revenue Blue Isle made in the aggregate and on each trade.

- The LPOA stated that Mediatrix was entitled to charge monthly performance fees only if there was positive performance that exceeded the previous highest results in the account (*i.e.*, a previous "high water mark"). Mediatrix charged performance fees that were not permitted under the agreements, and to which it was not entitled.

90.     On deposits of investor funds into the Coverage Accounts from March 2016 to September 2019, Blue Isle collected approximately $45 million in markup revenue and EUK and EAM received millions in commissions and markups on top of Blue Isle's revenue. These amounts

represented proceeds from the fraud for which Defendants provided no valuable reciprocal goods or services and to which they have no legitimate claim.

91.     Upon information and belief, Defendants and Mediatrix/Blue Isle took significantly more than $50 million of Investor Funds in the form of fees and costs.

92.     Mediatrix/Blue Isle controlled the frequency and volume of trading in Managed Account Investors' accounts, including through the LPOA, which authorized Mediatrix to act as Account Manager with full authority to trade the investor account on these Investors' behalf. Mediatrix also served as the Fund Manager and Investment Manager to the Mediatrix Capital Fund.

93.      Investors' primary objective was to achieve profit through the forex trading engaged in by Mediatrix/Blue Isle. The Mediatrix FX Disclosure Document sent to each Managed Account Investor stated that Mediatrix would endeavor to achieve an objective of "capital appreciation" by making trading decisions based upon both "fundamental and proprietary trading methods. Mediatrix will be compensated through a "Monthly Incentive Fee or Performance Fee" constituting 50%, 40% or 35% of *profit* above any previous "high water mark."

94.     Mediatrix was a very large-volume trader. Over the life of the accounts at Equiti AM and Equiti UK, Mediatrix (via Blue Isle) traded, in aggregate, more than $561 billion, effectively churning the $74 million in Fraudulent Transfers to generate fees but no profits to Investors.

95.     Mediatrix's high average daily turnover was due in part to its employment of short-term trading strategies—including a scalping strategy, a very short-term aggressive form of trading—notwithstanding its representations that it "does not generally trade aggressively on a short-term daily basis," as stated in the Mediatrix FX Disclosure Document.

96.     Because Mediatrix was a high volume and high frequency trader, its trading success was dependent on having as low of costs as possible. Mediatrix's trading structure, consisting of two different brokers, each of which charged its own commissions, markups and other fees, was inconsistent with minimizing transaction costs.

97.     The value of the mark-ups Blue Isle charged Mediatrix may have fluctuated, however, across all trades it averaged approximately $80 per million traded. Factoring in the additional cost imposed on Mediatrix's trading by Defendants, the total costs were excessive.

98.     Considering that Mediatrix's strategy was based, at least in part, on high-volume high-frequency trading, the total transaction fees were extremely high and would have eliminated any possibility of the trading achieving profitability.

99.     The Mediatrix/Blue Isle Principals intention to defraud their investors and to trade with an intent to generate fee revenue and with reckless disregard for their investors' interests is evidenced by account statements' misrepresentation of Mediatrix/Blue Isle's actual trade performance.

### *Ponzi Payments*

100.    As another aspect of the scheme, the Mediatrix/Blue Isle Principals misappropriated certain investor monies from the Blue Isle bank accounts generally for their own use, to make Ponzi payments to investors, or otherwise improperly dissipated such monies, which therefore were never available to trade, and were not in fact traded. As noted above, Investors transferred $129 million to Blue Isle bank accounts based on representations that their funds would be used for forex trading. Blue Isle did not keep Investors' money segregated into separate accounts. Rather, all of Investors' money was commingled in Blue Isle's bank accounts.

101.     Of the approximately $129 million received from Investors, approximately $74 million was transferred to Defendants to engage in the excessive forex trading described above. *See* Sections IV.A and IV.B, *supra.*

102.     Of the remaining funds, Mediatrix/Blue Isle misappropriated or improperly spent over $40 million of Investor funds, including by spending them on personal luxuries (such as vacation homes and high-end vehicles); paying thousands of dollars in purported "business expenses" (including travel, legal fees, and entertainment) designed to shroud the fraud behind a façade of legitimacy and solicit additional investment; and awarding themselves monies in the form of undisclosed mark-up revenue (known as "rebates") charged by Blue Isle on Mediatrix's fraudulent excessive trading.

103.     To sustain the fraud, Mediatrix/Blue Isle improperly made Ponzi payments to Investors seeking redemptions. The Mediatrix/Blue Isle Principals made approximately $30 million in redemption payments to Investors from Blue Isle's Bank Accounts in which Investor funds were comingled. Mediatrix/Blue Isle rarely, if ever, made a corresponding withdrawal of funds from the Coverage Accounts to the Blue Isle Bank Accounts in connection with a redemption payment to an Investor and, in any event, its trading in the Coverage Accounts was losing in nature. Indeed, the total amount Blue Isle received from Defendants was far less than the $30 million paid to Investors in redemptions.

104.     Thus, Mediatrix/Blue Isle operated as a Ponzi scheme. Money sent to Mediatrix/Blue Isle for investment purposes was used to enrich the Mediatrix/Blue Isle Principals and their associates (including Defendants), sustain the fraud by keeping the operation afloat, and

hinder and delay the discovery of their fraud via redemption payments to existing Investors using money recently deposited by new Investors.

105.     Mediatrix/Blue Isle's intent to defraud is presumed when the payments were made pursuant to Ponzi-style payments.

### The Mediatrix/Blue Isle Principals Made Misrepresentations to Obtain Investor Assets

106.     Mediatrix/Blue Isle made a variety of false and misleading statements at, or before the point of sale, that were intended to entice and persuade Investors to deposit their funds into bank accounts held in the name of Blue Isle for purposes of investment, but in fact to participate in the scheme described above. Certain of these same statements were also repeated after Investors made their investment, to entice and persuade investors to continue investing (and refrain from seeking redemptions/refunds), or to increase the amount of their investments.

_Misstatements Regarding Investment Objectives_

107.     Onboarding Disclosure Documents for Managed Account Investors represented that Mediatrix intended to achieve an objective of "capital appreciation" and that Mediatrix "does not generally trade aggressively on a short term daily basis."

108.     Promotional materials, including email newsletters disseminated to Investors either before or after their initial investment, represented that Mediatrix's trading entailed little risk because, for among other reasons, its "motto" was "Capital Preservation first, profits second," and its trading was "conservative" in nature.

109.     These statements were false and misleading because the trading by Mediatrix/Blue Isle was high-volume and often short-term in duration, excessive, speculative and losing in nature, and intended to generate fees, regardless of whether the trading was profitable. Therefore, such

trading was not intended to preserve Investors' capital or to cause it to appreciate. These misstatements were part of the broader Mediatrix/Blue Isle Fraud in so far as the Mediatrix/Blue Isle Principals knew, or were reckless in not knowing, that these statements were false and misleading in relation to the actual trading that they executed in Blue Isle accounts.

*Misstatements About Trading Performance and Track Record*

110.     Promotional materials disseminated to the Investors either before or after their initial investment misrepresented Mediatrix's trading performance and track record as follows:

- The Mediatrix Managed FX Funds Prospectus contained a bar graph that falsely represented Mediatrix had generated consistently positive trading monthly returns ranging from 1.71% to 30.35% starting in December 2013, describing such returns as "individual monthly returns that are actual real live results audited from December of 2013 through the present day."

- A promotional document entitled "Navigator ALGO Program Net of 35% Performance Fee Market Report - August 2018" disseminated in October 2018 indicated that between 2013 and 2018, Mediatrix's trading had realized profits of 2.87% in December 2018, 45.55% in 2014, 136.48% in 2015, 107.63% in 2016, 55.63% in 2017, and 33.62% between January and August 2018.

- A Mediatrix promotional document known as the "Pitch Deck" contained false performance figures and (in a section headed "Invitation to Join the Managed Account Program and/or Investment Fund") falsely stated that Mediatrix had "verified, annualized net returns of 50%+ per year since December 2013".

- Mediatrix represented it had achieved consistently profitable trading performance. A 2018 version of a Mediatrix Capital White Paper falsely stated that, as of June 2018, Mediatrix had made 54 straight months of client gains. An April 4, 2018 marketing email stated that Mediatrix was "now at 53 months in a row with positive gains."

- Mediatrix and the Mediatrix/Blue Isle Principals provided Investors and prospective investors with a 2018 report from Grant Thornton Bahamas purporting to confirm positive monthly returns generated by Mediatrix. The report was false and misleading because it was based on false account statements provided by Equiti UK on Mediatrix's behalf, and at Stewart's request.

- In its own account statements provided to investors, and through email communications, Mediatrix also purported to charge Investors "performance" fees

based on having achieved "high water marks" regarding its trading, which were not in fact due to Mediatrix as they were based on falsely inflated trading results.

All of these performance-related statements were false, which Defendants knew, because Mediatrix/Blue Isle only achieved an aggregate profit in two months: once in March 2016, where it profited by $575, and two months later in May 2016, when it achieved an aggregate three-month profit of approximately $353,000. Every month after that Mediatrix/Blue Isle had an aggregate loss. Some months' losses were as high as several million dollars. By September 2019, Mediatrix/Blue Isle had incurred aggregate trading losses of more than $32 million. The Mediatrix/Blue Isle Principals did not disclose these losses to Investors but rather, actively concealed them.

111.     Promotional documents including "FAQ's," the Mediatrix "White Paper" and the "Pitch Deck," represented that Mediatrix had been operating and trading successfully since December 2013. These statements were false and misleading because Mediatrix was not formed until 2015 and did not receive its first investor funds until about March 2016.

*Misrepresentations Regarding Custody of Investor Funds*

112.     As a result of well-known scandals involving Bernard Madoff and other fraudsters, certain Investors were concerned about the risk of fraud and safety of their principal invested. Of course, such fears turned out to be both reasonable and well-justified.

113.     The Mediatrix/Blue Isle Principals and Defendants took steps to allay such concerns by misrepresenting that, in effect, Defendants were regulated entities that had custody of investor funds. In a "Flow of Funds Chart" received by certain investors, Mediatrix/Blue Isle stated that "[a]ll Client Accounts funds are sent and held with PB [EUK, the "Prime Broker"]," thereby indicating that all investor funds were sent to EUK. A separate "Flow of Funds" document received

by Dennison on April 16, 2019, indicated that after Blue Isle receives client funds, it "wires client funds to Divisa Capital (Prime Broker) to Omnibus [account who acts as custodian for funds." Similarly, Stewart told investor B.S. on September 14, 2017 that "[w]hen Blue Isle receives a wire it is automatically forwarded to our Omnibus account held with Divisa [the former name of EUK] at Wells Fargo UK."

114.    During an October 2017 phone call with investor B.S., in response to B.S.'s question regarding what safeguards were in place to protect against the unauthorized use or withdrawal of his money, and his expressed concern regarding whether any principal invested could be returned upon his request, Dennison assured him that EUK, which was strictly regulated, held all of Blue Isle client assets, he could "s[ee]" all of Blue Isle's trading, and therefore, he confirmed B.S.'s assets were safe and Blue Isle's track record of returns was real. Similarly, on May 30, 2019, Dennison told B.S. in another phone call that it was reasonable to assume that effectively all the Blue Isle customers' money was held in its omnibus account at EUK, and that EUK had done all necessary due diligence on all Blue Isle shareholders and found all to be satisfactory.

115.    These statements were false and misleading because, as known by EUK and the Mediatrix/Blue Isle Principals, investor funds intended for trading were initially sent to the Blue Isle Bank Accounts, where they were at risk of misappropriation or other misuse; these funds were not "automatically" forwarded to EUK or EAM.

*Blue Isle and EUK Misrepresented the CFTC Bar Order*

116.    The Mediatrix/Blue Isle onboarding Disclosure Documents provided to Managed Account Investors, which included a flattering bio for Stewart, affirmatively stated that "there

[were] [no] . . . Material [litigation] actions regarding the Advisor or any principals of the Advisory Team." This statement was false because Michael Stewart had been sanctioned in the United States for forex fraud and permanently barred from registration by the U.S. Commodities and Futures Trading Commission ("CFTC Bar Order").

117.     Dennison misrepresented in the October 2017 call with B.S. that EUK had performed due diligence and had found "no issues" regarding Blue Isle and its shareholders, without disclosing the CFTC Bar Order. Defendants knew about the CFTC Bar Order early on in their relationship with Blue Isle. In February 2016, EUK's then-Chief Compliance Officer ("CCO") obtained a WorldCheck Report on Stewart which identified him as 'High Risk' based on the CFTC lawsuit and resulting industry bar against him. By no later than March 2016, EUK's board of directors learned of the CFTC Bar Order, including that the CFTC had found Stewart had made fraudulent misrepresentations regarding the profitability and operational history of his forex trading system.

118.     B.S. caused his family accounts to invest more than $3.7 million in additional funds with Mediatrix/Blue Isle in reliance on the statements made during this call.

119.     On June 27, 2019, Mario Camara, Equiti's Global Head of Legal & Compliance, responded to B.S.'s communication summarizing his previous call with Mr. Dennison, including Dennison's comments about having done all necessary due diligence on all Blue Isle shareholders, that Blue Isle was an "important and valued client of the Equiti group," that it had recently "review[ed]" Blue Isle, and that EUK had "not had any abnormal issues with" Blue Isle that "would be out of the ordinary in a broker-dealer relationship," again without disclosing the CFTC Bar Order.

120.     These statements were false and misleading because, again as known by Dennison, EUK and the Mediatrix/Blue Isle Principals, the undisclosed CFTC Bar Order belied the claims that EUK's due diligence had unearthed no abnormal information and that there were no "Material [litigation] action[s]" relating to the principals.

*Misrepresented Independence of Blue Isle and Mediatrix*

121.     Mediatrix claimed that it and Blue Isle were independent entities. The Mediatrix/Blue Isle Principals' creation and use of Blue Isle had no legitimate business purpose (other than to facilitate Defendant EUK's acceptance of Blue Isle as a client). Rather, such creation and use was intended to enable them to charge the undisclosed markups, referred to by the Mediatrix/Blue Isle Principals as "rebates," which they could then pocket.

122.     The following statements suggested or implied that Mediatrix and Blue Isle were independent entities:

- Mediatrix claimed in a January 17, 2017 press release that it selected Blue Isle "after several months of discussions and an in-depth review of" Blue Isle's "boutique" trading platform.

- Mediatrix's Managed FX Fund Disclosure Documents stated that, ". . . our primary Prime of Prime Broker is Blue Isle Markets Inc. dba/ Blue Isle FX."

- The Limited Power of Attorney (LPOA) stated: "Account Manager [Mediatrix] is not an employee or agent of BIFX [Blue Isle]. BIFX does not review, recommend, or endorse Account Manager, nor does BIFX review Account Manager's past performance or performance in the Account."

- The Mediatrix Capital Fund Confidential Explanatory Memorandum described certain purported conflicts of interest involving the Fund's "manager" and "brokers" without referring to Blue Isle specifically.

123.     These statements were false and misleading because Blue Isle was not independent from Mediatrix. Mediatrix did not select Blue Isle as its broker through a meritocratic process and

the other statements above were misleading in that they did not disclose the Mediatrix/Blue Isle

Principals operated and managed both entities. The two companies shared an office and each was

functionally an alter ego of the other, thereby creating an undisclosed conflict of interest.

*Misrepresented Assets Under Management*

124.     Promotional "Navigator ALGO" documents disseminated by the principals of

Mediatrix/Blue Isle falsely represented that it had assets under management ranging from $90

million to $300 million.

125.     These statements were false and misleading because Mediatrix's AUM was less

than $39 million as of December 2017 and less than $36 million as of the end of December 2018,

a fraction of what Mediatrix/Blue Isle claimed.

*The Mediatrix/Blue Isle Principals Sent Fraudulent Account Statements to Investors to Cause
Them to Remain Invested, or Increase their Investments*

126.     After Investors in the Managed Accounts invested with Mediatrix/Blue Isle, they

received daily and/or monthly "Blue Isle" account statements generated automatically from the

MT4 software controlled by and licensed by EUS. The statements purported to show dollar

amounts resulting from particular trades under the caption, "Trade P/L," depicted cumulative total

trading results next to the words, "Deposit/Withdrawal," while further indicating that "Closed

Trade P/L" and "Floating P/L" results were "0.00." These account statements generally purported

to show ever-increasing monthly account balances along with the withdrawal of monthly

performance fees based on the purportedly successful trading, without disclosing any information

under the columns "Commission" or "R/O Swap."

127.     The account statements Mediatrix/Blue Isle sent to these investors—purporting to

show they were realizing ever-greater monthly returns—were fraudulent because they did not

disclose Mediatrix/Blue Isle's accounts actual trading losses, including both "closed" and "open" or "floating" losses. Further, the statements' depiction of the trading results as "Deposit/Withdrawal" was misleading because Blue Isle was, in fact, engaging in trading, and the disclosure that there no "Closed Trade" or "floating" profits/losses was false and misleading. The Mediatrix/Blue Isle Principals knew of the falsity of these account statements.

128.     Investors in the Mediatrix Capital Fund received monthly statements from its administrator that set forth the Mediatrix Capital Fund shares owned by the investor, the net asset value (NAV) per share, the value of the shares at the end of the month, and the return for the month. As with the Managed Account statements, the Mediatrix Capital Fund statements generally showed consistent profits.

129.     Through these Blue Isle account statements, Investors were led to believe that their investments were generating high returns just as they were promised. This induced the Investors to either leave their money in their account, or, in some cases, invest even more money.

130.     In sum, Mediatrix/Blue Isle's fraudulent representations caused Investors to transfer approximately $129 million to Mediatrix/Blue Isle, which in turn transferred more than $74 million to Defendants in furtherance of its fraudulent scheme.

**C.  DEFENDANTS KNEW OF THE FRAUD ENGAGED IN BY BLUE ISLE**

131.     Defendants knew about the various aspects of the excessive trading/Ponzi scheme perpetrated by Mediatrix/Blue Isle. Regarding excessive trading, they were aware that Mediatrix/Blue Isle was trading investor funds at unsustainably high volumes and collecting more money in fees and commissions than it was generating through its loss-making trading. Defendants knew that despite the Blue Isle account losses, Blue Isle charged or received significant fees from

trading in the Coverage Accounts. For example, Blue Isle, which was needlessly interposed between investors, Mediatrix, and Defendants, charged "markup fees" to its clients on each trade, at rates far beyond market rates given the volume that Blue Isle traded. Indeed, over the course of Blue Isle's trading it accrued approximately $45 million in markup fees—which were not reported to clients on their account statements.

132.     On information and belief, EUK tracked Blue Isle's markup fees and EUS sent (frequently copying Dennison) Blue Isle daily markup profit reports detailing their daily markup profit. Given their intimate familiarity with Blue Isle's markup fee profits, Defendants had to know that: (a) Blue Isle's markup fee rates were grossly inflated and not in line with market rates given the equity in their accounts and their high-volume high-frequency trading strategy; and (b) such markup fees ensured that Blue Isle's trading activity would not be profitable to Investors. Indeed, the fee load on Mediatrix/Blue Isle's trading during the August 2017 to August 2018 time period was so high that, for Investors to break even on the trading, the trades would needed to have earned approximately 160% in profit on those trades, whereas Defendants knew that Blue Isle's accounts were experiencing trading losses.

133.     Defendants were also aware of Blue Isle's trading losses and poor performance. In fact, internal communications between and among Defendants' high-ranking executives discussed Mediatrix/Blue Isle's trading, account performance, and revenue. For example, in a June 2, 2017 chat between Mushegh Tovmasyan and Gary Dennison, Tovmasyan joked that Dennison should tell Mediatrix/Blue Isle "to stop losing money." Dennison then retorted, in effect, Mediatrix/Blue Isle is "always making [money] with [its] spread markup. . . Just imagine [its] clients [sic] pl . . . (shaking my head)."

134.     In addition, communications, including those involving Dennison and other executives or employees of Defendants, establish that the Blue Isle / Mediatrix Principals focused on the amount of markup revenue ("rebates") they received, regardless of the cost to Investors and impact on performance. For example:

- An October 10, 2017 WhatsApp message from Sewall to Stewart estimates the amount of rebates (i.e., markups) they would increase per day by allocating all their Blue Isle account capital to Equiti UK from Equiti AM, stating: "I estimate we would increase rebates by 35 to 40K a day if all this capital was on the UK side. 40k a day x 22 trading days = 880k. Say I'm off by 20% and it goes up only 30k a day. 660k a month."

- On April 10, 2018, Sewall sent a Skype message to an Equiti representative (Gary Dennison) stating: "I am transitioning to a higher volume system to keep our rebates up where they were."

- On April 13, 2018, Sewall sent a Skype message to Dennison stating, "going over and having to shut down and pull back is killing our rebates so we got to get back in bounds so we can keep the motor running."

- On June 11, 2019, Sewall sent the following Skype message to Dennison: "math for you: we did about 359k today at 50% of trade size. So at normal size that doubles, so that is 700k. Then add the other scalper and should get another 300k to 500k. wala 1m [sic] a day to help dig out of this mess / so even if it was a wash and we made nothing on those trades. we still add 1m a day to equity. / those are rebates. those go into equity. I will use some of the gain to offset losing trades."

- In a June 13, 2019 recorded call among Sewall, Stewart and Equiti representatives, Sewall stated: "Yeah, that was that was one of two scalpers running at 50% of volume, so do the math on what it would be full steam and how much money we would make. Do the math on what it would be full steam and how much money we would make. And I think that they say we made what 370 in rebates? So take 370 in rebates and double it, so that's 700,000 roughly in rebate and then add the other scalper that's not even running yet, which has the same performance as the first one just a different methodology to open and close the tray, and boom, there you are. You're in a million - millions of two a day in rebates and equity, and *that has nothing to do with- fortunately for us, it doesn't even have to do with the trade execution. And whether - whether it makes a penny for our clients, but it makes us a million two in rebates every day* that technically that goes into the coverage account. And again one full month of that adds 25 to $28 million in equity. Think how our discussion would be different if we had another $25 million in equity in there. It would be a totally different discussion. Because none of the numbers would change except for the equity. That's

what I'm trying to do, but the limits don't allow that. So let's takes me back to my first question. Are we trying to get out of the hole, or are we just trying to rearrange the deck chairs on the Titanic because we can come up with all the sophisticated scenarios in the world? But if we don't allow the system the way -the way to get the risk of fastest is to let it run and turn the [unintelligible] limits off. I know that doesn't make it anybody comfortable, but the traders have been telling you guys for a year that that's what needs to happen and the risk that guys say no. So the risk guys are the ones creating the risk. So that's what's frustrating. I mean, I've we've created, we've created the Holy Grail for you, but we can't fuckin run it. So that's the frustration. You know, $1,000,000 a day would make a big difference, would it not? Or is my calculator work differently than everybody else?"

- In a call with Stewart and Equiti representatives the same day, Sewall stated: "So I mean now here -- yeah, here's the other thing to keep in mind is the fact that -- and there's a -- there's another reason why we're going through these exercises. And one is, we gotta get this liquidity down because they're kneecapping us for half of our profits based on ratios. So, you know, the -- the only thing that's not affected by the execution is the rebate, which is why I'm beating on Michael that you know you got it. *We have to have enough space to run this because even if we didn't make a penny for our clients, okay? Even if, we would still make $1,000,000 a day in rebates* that goes right into the coverage account, which notches us up $1,000,000 bucks a day in equity. So that's issue one to getting out of the hole, okay? Cause if we do that on a 22 day trading month, you do the math. That doubles our equity every 30 days. I'm pretty sure that would change the landscape."

135.     Further, Defendant EUK was aware that Mediatrix was making representations about its investment performance to Investors that were highly suspect. For example, a Mediatrix Snapshot promotional newsletter that was emailed to Mushegh Tovmasyan, EUK's then-CEO, on November 11, 2016, showed performance of +1.1% for the previous month, and stated that Mediatrix is "now going on our 3rd year as clear winners each and every month with very little risk to the client." Tovmasyan received similar emails on December 12, 2016 (representing November performance of 16%), January 4, 2017 (representing December 2016 performance of 9.44%), March 20, 2017 (representing February 2017 performance of 4.54%), April 4, 2017 (representing March 2017 performance of 4.79%), May 8, 2017 (representing April 2017 performance of 3.85%), and June 9, 2017 (representing May 2017 performance of 7.77%).

136.     In addition, Defendant EUK, through Tovmasyan and Dennison, had to know that the statements about Blue Isle's and Mediatrix's independence from each other were false and misleading. From the outset, Defendants knew that although Mediatrix and Blue Isle presented themselves to investors as separate entities, the two entities were in fact alter egos. Defendants learned this through due diligence, communications with Mediatrix/Blue Isle's principals, who used "Mediatrixcapital.com" and "blueislefx.com" email addresses interchangeably. Indeed, in a March 20, 2017 e-mail EUK's then-CEO, Mushegh Tovmasyan, referred to Mediatrix and Blue Isle as "our clients 😊." Tovmasyan has acknowledged that he knew that the principals of both Mediatrix and Blue Isle" were the same people."

137.     Given their knowledge that Mediatrix and Blue Isle were in substance the same, Defendants' representatives had to know that representations being made to existing and prospective clients about Mediatrix's trading performance were false. At all material times EUK had access to, and monitored, MT4 data showing the generally losing trading performance of the Blue Isle Coverage Accounts. At least Dennison had apex "administrator" access to the MT4 server that allowed him to view all of Blue Isle' accounts and subaccounts and its trading therein. In joking Skype exchanges between Tovmasyan and Dennison in late May/early June 2017, Tovmasyan described Blue Isle as Equiti UK's "worst performer," and observed that if Blue Isle had larger limits it "…would have lost more money" and "Tell 'em to stop losing money" to which Dennison replied, "lol."

138.     EUK, including through Dennison, was aware, at a minimum, that the account statements emailed to Investors by the MT4 system that it licensed to Blue Isle through EUS fraudulently omitted open positions. Additionally, Dennison and, on information and belief, other

EUK personnel had access to underlying client sub-account data on the MT4 system from which it was clear that that data was configured so as to not accurately reflect actual trading results in the Coverage Accounts.

139.     Additionally, because Investor sub-account statements were automatically generated form the sub-account data on the MT4 system, and on information and belief EUK personnel had access to the MT4 sub-account data, EUK was aware that the sub-account statements did not accurately reflect the state of Investor's investments or Mediatrix's trading results.

140.     Further, EUK through Dennison and EUK's Head of Product, Mitesh Vaghela, was aware through discussions with Blue Isle's Director of Technology that the Mediatrix/Blue Isle Principals were reluctant to close out open losing positions, for fear that the losses would show up on the account statements.

141.     In September 2018, Dennison participated in email discussions (including with EUK COO Ayres and EGL CEO and EUK Board Member Najjar) with Stewart regarding the content and configuration of Blue Isle investor client account statements in which Stewart indicated that only closed transactions should be included.

142.     On information and belief, Defendant EUK knew about the Ponzi payments and related misappropriation of Investors' funds. On information and belief, on or around July 2017, Blue Isle sent Defendant EUK its bank statements as part of its due diligence/monitoring, which indicated that Blue Isle was improperly co-mingling client funds, making improper withdrawals, making Ponzi payments, and misappropriating funds for personal expenses (*e.g.*, golf carts, etc.), instead using it for forex trading.

**CLAIMS FOR RELIEF**

**COUNT I**

**Avoidance and Recovery of Fraudulent Transfers as Actual Fraudulent Transfers**

**Pursuant to C.R.S. § 38-8-101 *et seq.***

143.     Plaintiff realleges and incorporate by reference the previous allegations set forth in the Complaint.

144.     Plaintiff has the right to void the Fraudulent Transfers under C.R.S. § 38-8-105. Under C.R.S. § 38-8-105(1)(a) Plaintiff may avoid any transfer of an interest of a debtor if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

145.     Blue Isle's Fraudulent Transfers to the Defendants were made with the actual intent to hinder, delay, or defraud creditors. Here, there is direct evidence that Blue Isle made false representations to defraud Investor creditors and transferred funds to Defendants with the intent to further that that fraud. In addition, Blue Isle made the Fraudulent Transfers to Defendants in connection with and in furtherance of Mediatrix/Blue Isle's excessive trading/Ponzi scheme in which Blue Isle consistently caused Investors to incur extraordinary losses, hid those losses from Investors to induce further investments, and could only repay Investors with other Investors' funds, all the while Defendants and Blue Isle took the Investors' funds for themselves in the form of "fees" they charged for defrauding Investors.

146.     Ponzi-scheme operators such as Blue Isle have actual intent to defraud and such schemes are insolvent.

147.     Blue Isle did not receive value in exchange for the Fraudulent Transfers, which simply furthered Blue Isle's Ponzi Scheme, causing additional losses to Investors.

148.     Moreover, several "badges of fraud," set forth in CRS § 38-8-105(2) are present, including:

149.     The nature of the transfers, and the losses caused, and markups taken by Defendants, were concealed in account statements to Investors.

150.     The transfers were substantially all of Blue Isle's assets—its access to Investor Funds—because Blue Isle generated no legitimate profit and any fees purportedly earned were based on fraud committed on Investors.

151.     No consideration was received by Blue Isle—the transfers simply drove up Investor losses and fraud claims against Blue Isle.

152.     At all relevant times Blue Isle was insolvent because it its entire existence was based on its deceit of Investors and it earned no legitimate revenue.

153.     Additionally, and as set forth in detail in Section VI.C herein, Defendants had actual knowledge the transfers it received from Blue Isle were made by Blue Isle and the Mediatrix/Blue Isle Principals with the actual intent to hinder, delay and defraud the Investors. Therefore, C.R.S. § 38-8-108(1)(c) applies to this action and permits Plaintiff to recover one and one-half the value of the assets Blue Isle transferred to Defendants.

154.     As a result of the foregoing, Plaintiff is entitled to a judgment in its favor and against Defendants: (i) avoiding and preserving the Fraudulent Transfers; (ii) directing that the Fraudulent Transfers be set aside; (iii) recovering the Fraudulent Transfers, or the value thereof, from the Defendants; and (iv) pursuant to C.R.S. § 38-8-108(1)(c), for one and one-half the value of the assets transferred or for one and one-half the amount necessary to satisfy Plaintiff's claim, whichever is less, together with Plaintiff's actual costs.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants avoiding the Fraudulent Transfers pursuant to C.R.S. § 38-8-105 and grant such other relief as the Court deems appropriate.

## COUNT II

### Unjust Enrichment / Constructive Trust

148.     Plaintiff incorporates by this reference the previous allegations set forth in the complaint.

149.     Blue Isle conferred a benefit upon Defendants by making the Fraudulent Transfers.

150.     The benefit was accepted by Defendants under circumstances that would make it inequitable for them to retain the benefit.

151.     As a result of the foregoing, Defendants were unjustly enriched by the Fraudulent Transfers and should be required to return them to Plaintiffs.

152.     Among other things, to prevent unjust enrichment to unwind the inequities perpetrated by Defendants, the Court should impose a constructive trust on the Fraudulent Transfers in the possession of Defendants, which are traceable to Defendant's wrongful acts.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, the Receiver requests that the Court enter relief and judgment in its favor and against Defendants in the amount of 1.5 times all transfers found to be fraudulent including the $74,225,647 as alleged above, as follows:

1.      Declaring that the Fraudulent Transfers are avoided and set aside as fraudulent transfers;

2.      Directing and ordering that each of the Defendants, or any immediate or mediate transferee of each of the Defendants, turn over to Plaintiff the full amount of or value of the transfers they received by Defendants, including without limitation the Fraudulent Transfers, or any immediate or mediate transferee of such Defendants;

3.      Awarding judgment against each of the Defendants and in favor of Plaintiff in an amount equal to:

        a.      The full amount of the Fraudulent Transfers (and any other avoided transfers discovered after the date of this Complaint) made to each of the Defendants;

        b.      Pre-judgment interest at the maximum legal rate running from the time of the payment of the Fraudulent Transfers until the date of judgment herein;

        c.      Post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full; and

        d.      Attorneys' fees and costs incurred by Plaintiff in this suit;

4.      Impose a constructive trust on the Fraudulent Transfers in the possession of Defendants.

5.      Such and further relief as this Court may deem necessary and proper under the circumstances.

Dated: April 4, 2024

_s/ Michael R. MacPhail_
Michael R. MacPhail, CO Bar # 26382
Isaac T. Smith, CO Bar # 53487
Kyle R. Hosmer, CO Bar # 53214
**FAEGRE DRINKER BIDDLE & REATH LLP**
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3692
michael.macphail@faegredrinker.com
isaac.smith@faegredrinker.com
kyle.hosmer@faegredrinker.com

David W. Porteous
**FAEGRE DRINKER BIDDLE & REATH LLP**
IL Bar # 6257459 (admitted in D. Colo.)
320 South Canal Street, Suite 3300
Chicago, Illinois 60606
Telephone: (312) 356-5117
david.porteous@faegredrinker.com

James L. Volling, MN Bar No. 0113128
(admitted in D. Colo.)
**FAEGRE DRINKER BIDDLE & REATH LLP**
90 South 7th Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 766-7000
james.volling@faegredrinker.com

_Attorneys for Plaintiff_